ESTATE OF MILDRED LEE, DECEASED, NORMA LEE, PERSONAL REPRESENTATIVE, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Lee v. Commissioner
Docket No. 1241-82.
United States Tax Court
T.C. Memo 1983-594; 1983 Tax Ct. Memo LEXIS 190; 46 T.C.M. (CCH) 1511; T.C.M. (RIA) 83594; September 26, 1983. Louis A. Maier, Jr.,David H. Hutchinson, and Mary A. Klass for the petitioner. Joseph R. Peters, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In a statutory notice of deficiency dated October 19, 1981, respondent determined a deficiency in the estate taxes of Mildred Lee's estate in the amount of $12,517.47. After concessions, the sole issue for determination is the extent of Mildred Lee's interest in certain real property at the date of her death. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts *191 and exhibits attached thereto are incorporated herein by this reference. Mildred Lee (decedent) died on February 5, 1978. Norma Lee (petitioner), decedent's sister, is the duly appointed personal representative of decedent's estate and resided in Shorewood, Wisconsin, at the time the petition herein was filed. Petitioner timely filed an estate tax return and an amended estate tax return for the estate of decedent with the Internal Revenue Service Center, Kansas City, Missouri. Except for a few brief periods of time, petitioner and decedent resided together during their mutual lives. Prior to 1970, they rented various flats and apartments in Milwaukee and in Shorewood, Wisconsin. From sometime after 1957 until her retirement in 1973, decedent was employed by the First Wisconsin National Bank. A fringe benefit of this employment was that she was entitled to use her checking account free of service charges. During this period of time, petitioner was employed as a teacher by the Milwaukee Public School System, and she also held various part-time teaching positions. Petitioner's total compensation from such employment was at all times considerably greater than decedent's *192 compensation. Petitioner and decedent shared living expenses such as rent, food, utilities, the care of their pets, and the cost of operating an automobile owned by petitioner.The financial arrangements were handled very informally and, because she earned considerably more than decedent, petitioner sometimes contributed more towards these living expenses than decedent. Petitioner consistently paid a greater proportion of the rent than decedent paid. The sisters kept all other financial matters separate and independent from each other. They did not commingle their earnings or assets, and they each held their investments solely in their own names.Because decedent was entitled to a checking account free of service charges, both sisters used that account for their separate and joint expenditures. Prior to the date of decedent's death, petitioner did not have a checking account in her own name. Petitioner did her banking-related business primarily with financial institutions located near decedent's place of employment. For convenience, petitioner executed a power or attorney in favor of decedent authorizing decedent to make deposits and withdrawals on petitioner's behalf. When *193 petitioner desired to make an expenditure through decedent's checking account, decedent would make a withdrawal from one of petitioner's savings accounts and deposit the withdrawn funds in the checking account. In January of 1967, decedent retained an attorney to draft an offer on behalf of the sisters to purchase a vacant lot located in Shorewood for $11,500. Based upon his understanding that the sisters planned to contribute equally toward acquiring the lot and toward the cost of having a home constructed on it, the attorney recommended that title to the property be taken by the sisters as tenants in common. The offer to purchase was accepted, but due to problems with zoning restrictions and building permits, the purchase of the lot was never consumated. In February of 1969, the sisters offered to purchase a different vacant lot in Shorewood (the Richland Court lot) for $15,000. Each sister contributed $500 toward a $1,000 earnest money deposit made with their offer. This offer was accepted, and the purchase was closed on May 16, 1969. In accordance with a previous agreement, decedent cashed a $10,000 certificate of deposit owned by petitioner and approximately $9,500 of *194 those funds were used to cover petitioner's share of the purchase price. The remaining portion of the purchase price (i.e., $4,500) was contributed by decedent. As of that time the sisters intended that petitioner's contribution toward the cost of the lot and the cost of a house would be twice as much as decedent's contribution because of their disparate earning ability, i.e., decedent would contribute one-third and petitioner would contribute two-thirds of the total cost. The deed to the property was prepared by the attorney for the seller and recites a conveyance to "Mildred Lee and Norma Lee, as tenants in common." The closing documents were reviewed and approved on behalf of the sisters by their attorney. Their attorney was not informed by the sisters, however, that they did not contemplate that each sister would contribute equally toward to cost of a lot. Although Mildred contributed half of the earnest money tendered with the Offer to Purchase for the lot, she was becoming increasingly concerned about the possibility that, by providing her share of the funds necessary for the acquisition of the lot and construction of a home on it, she would jeopardize her ability to adequately *195 provide for herself after her impending retirement. Mildred's concerns were based primarily on the following factors: a. She had vested pension rights from the Wisconsin Banker's Association which amounted to only about $30 per month and she expected to qualify for only a small pension from First Wisconsin National Bank of Milwaukee.Accordingly, she was putting as much of her limited income as possible into savings accounts and other investments, hoping that they would provide her with enough income to sustain herself after retirement. b. The cost of the Richland Court lot was approximately 30 percent higher than the lot on which the sisters had planned to build in 1967, and building material costs had also increased substantially during the period from 1967 to 1969. The cost of living was increasing at a rather rapid rate and that consideration, along with the fact that decedent was experiencing some deterioration in her overall health status, made her post-retirement financial concerns considerably more acute than they had been in 1967. When the house was being planned, the sisters learned that the cost of the house would be much more than they had originally anticipated. *196 As a result of these developments, decedent was unwilling to pay one-third of the cost of the house, and petitioner decided to pay the entire cost herself.
On August 30, 1969, petitioner and decedent signed a contract with a general contractor for the construction of a house on the lot. Construction commenced shortly after the contract was signed and was completed in the late spring of 1970. During the construction period, petitioner handled all negotiations with the general contractor, subcontractors and suppliers, and made all major decisions concerning construction. The original contract price was $44,000, but due to unexpected difficulties and certain extras requested by petitioner, the final price was $46,500. The general contractor was paid in four installments with checks drawn on decedent's checking account. On the same date that each of the four checks was given to the contractor, funds for such payments were provided by petitioner via deposits derived from amounts withdrawn from her savings accounts or obtained by cashing certificates of deposit held by her. The amount of the checks and the funds deposited may be summarized as follows: Amount of
Funds Deposited
Draw No.
Date
Payment
by Petitioner
1
12/16/69
$11,500
$11,500.00
2
2/11/70
14,000
13,000.00
3
5/15/70
10,000
10,061.85
4
7/21/70
11,000
15,044.87
Total
$46,500
$49,606.72
*197 After the house was completed, petitioner paid all of the real estate taxes, insurance premiums, repair bills, and other major expenses associated with the ownership of the property. Both the original and the amended estate tax returns for decedent's estate (Forms 706) reported one-half of the date of death fair market value of the lot as part of her gross estate. No part of the value of the home was included in her gross estate. A cover letter dated February 2, 1979, and signed by the attorney who had previously represented the sisters and who at that time also represented the estate of decedent was attached to the amended return. The pertinent part of that letter stated: Also, the Personal Representative has informed us that the decedent contributed only $5,000 towards the purchase of the $15,000 lot in 1969. This represents one-third of the initial cost of the lot, instead of one-half the initial cost that we reflected on Form 706, filed on November 6, 1978. We have not amended Form 706 to reflect this new information. Respondent determined that one-half of the value of the land and one-half of the value of the residence is includible in decedent's gross estate.
*198 OPINION Section 2033 [1] provides that "the value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." [Emphasis supplied.] Our task is to determine the extent of decedent's interest in the subject lot and in the home thereon at the date of her death. To make that determination, we must refer to applicable State law. Harvey v. United States,185 F.2d 463, 468 (7th Cir. 1950); Aldrich v. United States,346 F.2d 37, 38 (5th Cir. 1965). See also Rule 302, Federal Rules of Evidence; Rule 143, Tax Court Rules of Practice and Procedure.
Section 700.20, Wis. Stat. Ann. (West 1975), provides: 700.20. Extent of undivided interest in tenancy in common. The extent of the undivided interests of tenants in common for the duration of the tenancy is determined by the intent expressed in the document of title, instrument of transfer or bill of sale; *199 if no intent is expressed in the document, instrument or bill of sale, tenants in common are presumed to own equal undivided interests for the duration of the tenancy. [Emphasis supplied.] The deed to the lot and the contract for construction of the house were in both sisters' names, and the extent of each sister's ownership in the properties was not delineated in either of those instruments. Thus, a presumption arises under the above statute that each sister owned an equal, undivided interest in those properties. That presumption, however, is rebuttable. It imposes on petitioner the burden of proving that the nonexistence of the presumed fact is more probable than its existence. Wis. Stat. Ann. section 903.01 (West 1975). [2]
*200 The Wisconsin Supreme Court in Jezo v. Jezo,23 Wis. 2d 399, 127 N.W. 2d 246 (1964), set forth the applicable law as follows: "* * * where a conveyance to purchasers of a tenancy in common is silent these purchasers are presumed to take equal shares. However, this presumption is a rebuttable one and does not prevent proof from being introduced that the respective holdings and the interests of the parties are unequal. In a showing of unequal contribution, in the absence of further proof the prior presumption is overcome and another presumption arises; that is, that the parties intended to share in proportion to the amount contributed by each to the purchase price." [Williams v. Monzingo,235 Iowa 434, 422, 16 N.W.2d 619, 622 (1944)]
* * * The rule is, therefore, that the interests of joint tenants being equal during their lives, a presumption arises that upon dissolution of the joint tenancy during the lives of the cotenants, each is entitled to an equal share of the proceeds. This presumption is subject to rebuttal, however, and does not prevent proof from being introduced that the respective holdings and interests of the parties are unequal. *201 The presumption may be rebutted by evidence showing the source of the actual cash outlay at the time of acquisition, the intent of the cotenant creating the joint tenancy to make a gift of the half-interest to the other cotenant, unequal contribution by way of money or services, unequal expenditures in improving the property or freeing it from incumbrances and clouds, or other evidence raising inferences contrary to the idea of equal interest in the joint estate. [Fn. ref. omitted.] Although the Jezo case involved the partition of certain real and personal property held as joint tenants, the rules espoused therein have been held by other courts to be equally applicable to the partition of real property held as tenants in common. See for example, Sebold v. Sebold,444 F.2d 864 (D.C. Cir. 1971). Petitioner argues that, on the date of decedent's death, she owned two-thirds of the lot and 100 percent of the home and that decedent's interest in the property was limited to a one-third interest in the lot. Respondent, on the other hand, asserts that decedent held a 50-percent interest in both the lot and the home. In support of his argument respondent claims *202 that decedent and petitioner contributed equally towards the cost of the lot and the house or, alternatively, that petitioner made a gift to decedent to the extent that her contributions toward such real property exceeded 50 percent. The facts set forth above establish that petitioner contributed more than decedent toward the cost of the lot and the cost of the home.Our inquiry as to the interest of decedent in the totality of the real property at the time of her death, however, does not end with the question of cash contribution. Respondent's determination still must be sustained if petitioner and decedent intended that they were to hold equal interests in the property (i.e., if petitioner made a gift to decedent to the extent that her cash contribution toward the cost of the lot or the house exceeded one-half). At the time that the lot was purchased in 1971, the attorney for the sisters was under the impression that the sisters were to own the lot in equal shares, and his impression was not changed through the time that the amended estate tax return was prepared. Both the original and amended estate tax returns reported that decedent held a one-half interest in the lot at *203 the date of her death. Although the cover letter sent with the amended return refers to a mistake, the amended return was not corrected "to reflect this new information." Each of the returns was signed by petitioner "under penalties of perjury" and must, therefore, be treated as an admission by petitioner that cannot be disregarded unless there is cogent evidence contradicting it. In response to questions as to whether or not she intended a gift, petitioner testified only that "that never occurred to me." Weighing the conflicting indicia in the record, we do not believe that petitioner has overcome the presumption of equal ownership arising from the form of the title as to the lot. The situation with the house, on the other hand, is substantially different. Decedent apparently had second thoughts about her ability to comply with the original agreement that she would contribute one-third of the total cost of improving the property. In response to questions as to why she contributed all of the money for the construction of the house, petitioner testified: "Well, when I started planning the house, and I planned it and I drove around and saw kitchens and everything that you look *204 at when you are building a house, a custom built house. And the house got so expensive, the cost ran so high, that my sister remonstrated. She said I can't pay one-third of that." Thus, the total cost of the house was borne by petitioner. On both the original and the amended estate tax returns petitioner consistently maintained that decedent held no interest in the house. Although it is reasonable to conclude that petitioner intended to give her sister an amount equivalent to $2,500--the difference between one-half and one-third of the $15,000 cost of the lot, it is more probable than not that she did not intend to give decedent an amount as large as $23,500--one-half of the cost of the house. See Wis. Stat. Ann. section 903.01 (West 1975), at footnote 2, supra. Accordingly, we hold that decedent held no interest in the house. In summary, decedent held at the time of her death an interest equal to 50 percent of the value of the lot and no interest in the improvements thereon. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. 903.01 Presumptions in general Except as provided by statute, a presumption recognized at common law or created by statute, including statutory provisions that certain basic facts are prima facie evidence of other facts, imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.↩